UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------x
                        :

LUIS E. RIVERA                  :            3:11 CV 98 (JBA)
                        :
V.                          :
                        :
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL SECURITY    :        DATE: SEPTEMBER 23, 2011
                        :
--------------------------------------------------- x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND
FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER</u>

      This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental

Security Income ["SSI"] benefits.

I.  ADMINISTRATIVE PROCEEDINGS

      On June 22, 2009, plaintiff, Luis E. Rivera, applied for DIB and SSI, claiming that he

has been disabled since October 30, 2008 due to a back injury, herniated disc, and knee

problems in both knees. (Certified Transcript of Administrative Proceedings, filed March 25,

2011 ["Tr."] 127-46, 162; <u>see</u> Tr. 125-26).[1]  Plaintiff's applications for DIB and SSI were

denied initially and upon reconsideration.  (Tr. 56-87).  On December 14, 2009, plaintiff filed

---

[1]At the time of his applications, plaintiff was receiving workers' compensation benefits.  (Tr.
127.  <u>But see</u> Tr. 32-33 (plaintiff testified that his benefits stopped)).  In his application for SSI,
plaintiff reported receiving workers' compensation benefits from an injury at Wal-mart on
December 31, 2005 in the amount of $858.00 for June 2009, $1,287.00 for July 2009, $858.00
monthly from August 2009 to December 2009, $1,287.00 for January 2010, $858.00 monthly from
February 2010 to June 2010, $1,287.00 for July 2010, and $858.00 a month beginning August
2010.  (Tr. 133-34, 141-42).  Plaintiff explained that the claim had been denied and he appealed.
(Tr. 134, 142; <u>see</u> Tr. 166)

a request for a hearing by an Administrative Law Judge ["ALJ"](Tr. 88-91; <u>see</u> Tr. 94-97), and on August 27, 2010, a hearing was held before ALJ Henry J. Hogan, at which plaintiff and vocational expert ["VE"], Renee Jubrey, testified. (Tr.25-55; <u>see</u> Tr. 102-24). Plaintiff was represented by counsel. (Tr. 92-93; <u>see</u> Tr. 25, 83). In a decision, dated September 17, 2010, plaintiff was found not disabled. (Tr. 7-21). On September 17, 2010, plaintiff's claim was selected for review by the Decision Review Board, and on January 11, 2011, the SSA issued its Notice of Decision Review Board Action, informing plaintiff that the Decision Review Board did not complete a timely review of plaintiff's claim, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On January 19, 2011, plaintiff filed his Complaint in this pending action, and nine days later, the case was referred from United States District Judge Janet Bond Arterton to this Magistrate Judge. (Dkts. ##1, 7). On March 25, 2011, defendant filed his Answer and the certified administrative transcript. (Dkt. #14).[2] On May 18, 2011, plaintiff filed his Motion to Reverse or Remand the Decision of the Commissioner, with brief in support. (Dkt. #18; <u>see</u> Dkts. ##15-17). On July 26, 2011, defendant filed his Motion to Affirm the Decision of the Commissioner, with brief in support. (Dkt. #19).

For the reasons stated below, plaintiff's Motion to Reverse or Remand the Decision of the Commissioner (Dkt. #18) is <u>denied</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is <u>granted</u>.

## II. FACTUAL BACKGROUND

Plaintiff was born in1979 and is thirty-two years old. (Tr. 31, 127, 131, 139, 158, 178, 188). Plaintiff has a tenth grade education (Tr. 42, 167, 231, 245) and he has never

---

[2]The certified administrative transcript is dated March 7, 2011.

been married (Tr. 31, 128, 131, 139), although he lives with his two daughters and their mother.[3]  (Tr. 31, 36-37, 231, 245).

Plaintiff's employment history spans from 1994 until 2008[4] and includes experience in mostly "unskilled work in the medium to heavy lifting capacity" as a janitor and warehouse and stock worker. (Tr. 163, 170, 172; see Tr. 149-57, 204).  Most recently, in 2008, plaintiff worked for Advanced Solution, an employment agency, through which he obtained work as a forklift operator. (Tr. 233, 247).[5]  Plaintiff testified that this job entailed driving a forklift, standing, and picking up merchandise, which exacerbated his back pain, so that eventually his doctor recommended against working in this position.   (Tr. 49-50; see Tr. 228).  According to plaintiff, "his 'legs gave out on him' and his back pain did not diminish[,]" so after one month, he quit when his wife got a security job.[6]  (Tr. 233, 247; see Tr. 33, 49-50).  Plaintiff testified that he could not function at the job because he could not take breaks as needed.  (Tr. 33).  Plaintiff also reported that he stopped working because he was injured on the job on October 30, 2008, and now he cannot sit or stand "for a long time[,]" and cannot carry things weighing more than twenty pounds. (Tr. 162).  Plaintiff requested "a sit down job[,]" but he was told that the employment agency "had none."  (Tr. 233, 247).  After this experience, plaintiff tried to find jobs at fast food restaurants, but after applying to "like hundred of jobs[,]" plaintiff was not successful.  (Tr. 33-34).

---

[3]But see Tr. 231, 245 (describing plaintiff as married). Plaintiff also reported that he lives alone in a room in a private home separate from his landlord's household. (Tr. 132, 140).

[4]Plaintiff testified that he stopped working in 2005 until his treating physician suggested he get a light duty job.  (Tr. 33).

[5]See note 4 supra. (See Tr. 33, 49, 151-52, 228).

[6]See note 3 supra.

When plaintiff worked in 2002 until December 2005 at various businesses as a warehouse and stock worker, his duties included unloading tractor trailer deliveries, stocking shelves, and helping customers by loading large heavy items, such as televisions and furniture, into vehicles for eight hours a day, five days a week. (Tr. 163, 170, 172, 233, 247; see Tr. 204).[7] In these positions, over the course of an eight hour day, plaintiff claimed to have walked for four hours, stood and handled large objects for two hours, and climbed, stooped, kneeled, crouched, crawled and reached for one hour. (Tr. 163, 172). The heaviest weight plaintiff lifted was one hundred pounds or more, and he frequently lifted objects weighing less then ten pounds. (Tr. 163-64, 172-73).

In addition to the work described above, plaintiff also worked as a janitor at Saint Francis Hospital from 1998 until 2000, in which job he worked full time, six days a week, cleaning, vacuuming, sweeping and stripping floors. (Tr. 42-43, 204, 210). The heaviest and most frequent weight he lifted was ten pounds. (Tr. 210). Plaintiff worked full-time at the Dollar Tree in 2000, stocking the store, "fixing the back room[,]" and unloading a truck biweekly. (Tr. 204-05). The heaviest weight plaintiff lifted was forty pounds and he frequently lifted ten pounds. (Tr. 205). Plaintiff worked at Burger King in 2002, preparing hamburgers and cleaning the outside of the store. (Tr. 43, 204, 207). Plaintiff worked full-time and was on his feet for all but one hour out of an eight hour workday. (Tr. 43, 207). The heaviest weight plaintiff lifted was twenty pounds and he frequently lifted less than ten pounds. (Tr. 43, 207). Plaintiff reported that "he would be willing to go back to this type [of] job but he cannot stand for the long hours required in that type of work." (Tr. 233, 247). Additionally, from 2002 to 2003, plaintiff worked at a Sears Outlet, moving refrigerators,

---

[7]Plaintiff performed similar work for Sysco in 2000-01, unloading trucks and stacking pallets. (Tr. 206). The heaviest and more frequent weight plaintiff lifted was fifty pounds. (Id.).

washers, dryers, televisions, and beds into customers' cars.  (Tr. 43, 204, 208, 233, 247).
He used machines, tools, or equipment in that position.  (Tr. 208).  The heaviest and most
frequent weight that plaintiff lifted was one hundred pounds or more  (Tr. 43, 208), and
plaintiff "left that job in late 2003 when he injured his back while he [was] helping a customer
load a TV into [his or her] car."  (Tr. 233, 247).[8]  Finally, plaintiff worked at Wal-mart from
2004 until 2005 unloading trucks, stocking shelves, carrying televisions and bikes, and
assisting customers by pushing their carts and loading their cars.  (Tr. 44, 204, 209).  Plaintiff
lifted one hundred pounds or more in this job, and plaintiff reported that "he liked this work
and would go back to it if he had the physical capacity[,]" but he was injured at the job.  (Tr.
44-45, 209, 233, 247).[9]

Plaintiff has taken or is currently taking the following medications: Amitriptyline,
Cyclobenzaprine, Gabapentin, Lyrica, Methocarbamol, Tramadol, Topiramate, Carisoprodol,
and Lidoderm patches.[10]  (Tr. 167, 198, 222-25, 227-30, 232, 246, 298-300).  Plaintiff's has
also taken Diazepam and Oxycodone.  (See Tr. 230, 298).

Plaintiff suffers from a back injury in the form of a herniated disc, as well as bilateral
knee problems, which cause him difficulty walking, sitting or standing for long periods of
time, and carrying objects weighing in excess of twenty pounds. (Tr.  57, 64, 162, 185).  He
also reports pain walking, his legs going numb, and an inability to lift, twist, bend, squat, or
kneel due to his back pain.  (Tr. 185; see also Tr. 45-46).

---

[8]See note 15 infra.

[9]Plaintiff testified before the ALJ that he worked for UPS unloading trucks for about two
months where he would lift or carry about a hundred pounds, but this work history is not reflected
in the record. (Tr. 44).

[10]Plaintiff reported "some drowsiness . . . from time to time" from Tramadol, Gabapentin,
and Carisoprodol.  (Tr. 232, 246).

He described his normal day as waking up to care for his "Baby Girl[ ]s"[11] and being home with them from the morning until their mother returns home from work in the late afternoon, which then allows him to "[r]elax." (Tr. 196; <u>see also</u> Tr. 37-40). However, plaintiff testified that his mother helps him with the children "[p]robably like four times a week" for "six, seven hours." (Tr . 32; <u>see</u> Tr. 231, 245).

According to plaintiff, his condition prevents him from running, playing sports, and playing with his children, and he wakes during the night to take one or two pills because he cannot sleep with the pain or endure his leg cramps. (Tr. 197). Despite his physical condition, plaintiff prepares his own meals, takes out the trash every two to three days, drives a car, shops for groceries, and pays bills. (Tr. 198-200). However, according to plaintiff, he can only walk about two blocks at a time before stopping, and he does not follow written instructions well nor does he "like" stress, but he follows spoken instructions "ok[,]" and gets along with authority figures "good." (Tr. 202).

Plaintiff flies toy planes when he can, plays video games "once [sic] in a blue [moon]" and watches sports and television every day. (Tr. 200, 231, 245; <u>see also</u> Tr. 38, 40-42). However, he is limited in how long he can perform these activities, which, in plaintiff's words, "suck[s] because [I'm] so young [b]ut [I] feel so old and it hurts." (Tr. 200). Besides these hobbies, plaintiff also claims to enjoy spending time with his family because it makes him happy. (Tr. 201). Plaintiff observes changes in his social activities due to his condition

---

[11]Plaintiff testified that he feeds and puts the children to bed daily. (Tr. 31). He puts his younger daughter "in the playpen and then [watches] TV," and whenever she needs to eat, "if [his] mom's not there to help [him], [he will] give her something to eat, and put her to sleep for a little while." (Tr. 39). While plaintiff's mother usually takes his older daughter to the bus stop for school, he admitted to being able to take his daughter half a block to the bus stop when his mother is not available. (<u>Id.</u>). Plaintiff further testified to caring for his older daughter for one hour after she returns home from school before his girlfriend comes home from work. (<u>Id.</u>).

and acknowledges he cannot do activities like he used to. (Id.). Additionally, plaintiff reports his condition affects his ability to lift, squat, bend, stand, walk, sit, and kneel. (Id.).

Plaintiff's medical records begin with his spinal fusion surgery on September 4, 2007, at which time he was admitted to Hartford Hospital for three days. (Tr. 212-20). Plaintiff underwent a laminectomy of L4, exploration of L4-L5, exploration of L5-S1, diskectomy of the left side of L5-S1, and bilateral lateral fusion of L5-S1 using a right iliac crest bone graft and instrumentation performed by Dr. Gerald Becker of the Orthopedic Association of Hartford. (Id.). Dr. Becker has treated plaintiff's back condition since January 2006 (see Tr. 165, 183), and the spinal infusion surgery of September 2007 was to treat plaintiff's disc herniation between L5 and S1 and degenerative disc disease of L5-S1.[12] (Tr. 45, 212-20). Upon discharge, plaintiff was directed to be up as tolerated with the assistance of his lower back brace, forego bending, twisting, and heavy lifting, and he was prescribed Percocet for his pain, Robaxin for his muscle spasms, and enteric-coated aspirin. (Tr. 213).

Plaintiff received follow-up care related to his back surgery from Dr. Becker on January 14, 2008. (Tr. 221). He reported continued use of his corset, beginning physical therapy, and continuing pain, which "[was] gradually decreasing." (Id.). He presented with tight back muscles and reduced range of motion, but in Dr. Becker's opinion, plaintiff was "healing satisfactorily" and "remain[ed] disabled from work." (Id.).

One month later, on February 15, 2008, plaintiff returned to Dr. Becker with improved leg pain, but plaintiff still suffered from "some radiating leg pain to the right calf[,]" as well as episodic back pain that was severe at times. (Tr. 222). Plaintiff was doing satisfactorily, but Dr. Becker observed that he was "mildly overweight[,]" such that he recommended

---

[12]Dr. Becker noted plaintiff's L4-L5 vertebra were stable. (Tr. 214).

additional physical therapy, weight loss, and exercise.  (Id.).  Dr. Becker noted that plaintiff was still disabled from work.  (Id.).   He was given samples of Lyrica for his leg pain.  (Id.).

Plaintiff returned to Dr. Becker on March 21, 2008 with reduced range of motion and tight back muscles.  (Tr. 223).  Dr. Becker opined that plaintiff "has ongoing pain status post an L5-S1 decompression and fusion[,]" and was still disabled from work.  He recommended that plaintiff increase his Lyrica intake, and continue to attend physical therapy sessions. (Id.).

On April 28, 2008, Dr. Becker noted plaintiff's continued complaints of ongoing leg and back pain, and he observed tight back muscles and moderate abdominal obesity.  (Tr. 224).  He diagnosed plaintiff with chronic pain and noted plaintiff was "not a candidate for further surgery."  (Id.).  He recommended weight loss and exercise.  (Id.).  In Dr. Becker's opinion, plaintiff was capable of part-time, sedentary to light work for four hours a day.  (Id.).

Two months later, on June 30, 2008, plaintiff returned to Dr. Becker complaining of lower back pain.  (Tr. 225).  Dr. Becker again noted plaintiff's abdominal obesity, tight back muscles, normal motor strength, and negative straight leg raising bilaterally.  (Id.).  He also noted that plaintiff "has a part-time light duty work capacity." (Id.).

On September 8, 2008, plaintiff presented to Dr. Becker with lower back pain, reduction of range of motion in his back, moderate back tightness, normal motor strength, and negative straight leg raising.  (Tr. 226).  X-rays of plaintiff's back were taken, and Dr. Becker reiterated that plaintiff had a light duty work capacity and he opined that plaintiff "ha[d] reached maximum medical improvement with a 28% permanency of the back." (Id.).

One month later, in a note dated October 22, 2008, Dr. Becker recommended Lidoderm patches to control plaintiff's pain in conjunction with a reduction of his other

prescription pain medication as a "medical[] necess[ity] of his work-related back injury." (Tr. 227). Plaintiff was seen by Dr. Becker a month later, on November 17, 2008, for a follow-up examination at which time he exhibited a mildly positive straight leg raising test on his left side. (Tr. 228). He complained of continuing back pain and told Dr. Becker that he tried "driving a forklift and was not able to do this even part time[,]" such that "[h]e [would] look[ ] for alternative employment in a light duty capacity." (Id.). Dr. Becker prescribed refills of his pain medication and recommended weight loss, exercise, and light duty work. (Id.).

On April 6, 2009, plaintiff returned to Dr. Becker for a follow-up appointment, at which Dr. Becker noted that plaintiff was experiencing radiating pain down his right leg in addition to his lower back pain. (Tr. 229). He noted plaintiff's "[a]bdominal obesity[,]" "laxity of the abdominal musculature[,]" and "mildly positive straight leg raising bilaterally." (Id.). Dr. Becker reiterated plaintiff's ineligibility for surgery and recommended weight loss, exercise, light-duty work, and prescription pain medication. (Id.).[13] Dr. Becker concluded that plaintiff had "a light duty work capacity." (Id.).

Dr. Becker met with Attorney Timothy Knotts on June 24, 2009 to discuss plaintiff's L5-S1 disc injury at Wal-Mart. (Tr. 230). Dr. Becker noted plaintiff's pre-existing degenerative disc disease, history of back injuries, achievement of maximum medical improvement with a 28% permanency, and permanent light-duty work capacity. (Id.).

At plaintiff's follow-up examination on August 10, 2009, plaintiff reported continuing lower back pain but "[h]is legs [were] doing fairly well at the present time." (Tr. 298). He

---

[13]According to plaintiff, he was treated at the Emergency Department of Hartford Hospital in May 2009, but there are no medical records of these visits. (Tr. 165, 183). Additionally, plaintiff reported receiving general medical treatment, as well as specialized treatment, relating to his back pain in May 2009 at UCONN Health Partners, but again, there are no medical records substantiating the same. (Tr. 165-66).

told Dr. Becker that he went to the emergency room on March 10, 2009 because he could not get an appointment with Dr. Becker. (Id.). Plaintiff had a negative straight leg raising test, tight back muscles, and lax abdominal musculature, for which Dr. Becker recommended weight loss, exercise, and Tramadol. (Id.).

Plaintiff again complained of lower back pain to Dr. Becker on December 14, 2009. (Tr. 299). Dr. Becker observed normal neurologic strength, negative straight leg raising, abdominal obesity, and lax abdominal muscles. (Id.). He opined that plaintiff's pain was derived from "scar and deconditioned musculature[,]" and he prescribed weight loss, exercise, and Tramadol and Topiramate to address his leg pain. (Id.). He also noted that "[d]ue to limitations with regard to return to work, [plaintiff] will pursue Social Security Disability benefits." (Id.).

Ronald Freedman of the Center for Career Development composed a Vocational Assessment Report of plaintiff on April 26, 2010, used for plaintiff's Workers' Compensation case. (Tr. 29, 231-58).[14] Freedman recounted plaintiff's medical history in this report,[15] and plaintiff reported to Freedman that "he is in good health except for his back condition[]" and can lift and carry between fifteen to twenty pounds; however, this statement was further qualified by "the more often he has to lift and carry during the daytime, the more his pain

---

[14]This report appears twice in the administrative record.

[15]Freedman referenced plaintiff's medical records as follows: on December 31, 2005, plaintiff suffered a herniation of the L5-S1 disc, and underwent subsequent treatment of epidural shots through 2007, diskectomy and fusion surgery, and physical therapy in early 2008; Dr. Becker assessed plaintiff as capable of sedentary, part-time work capacity in early 2008, which Dr. Becker increased to light duty work capacity in the fall of 2008 in conjunction with plaintiff reaching maximum medical improvement with 28% permanency. (Tr. 232, 246; see also Tr. 224, 226). Additionally, there is reference to a previous back injury in 2003 that plaintiff received while working at Sears, which injury was "a 'disc bulge at L5-S1 and a tiny central L4-L5 bulge [seen] by MRI in 2/04 . . . . [Plaintiff] was given a 5% impairment rating of his lumbar spine by a Dr. Spinella.'" (Tr. 232, 246).

and spasms increase in his back and right leg." (Tr. 232, 246). Plaintiff reported that he must alternate between sitting for fifteen to twenty minutes, standing for the next fifteen to twenty minutes, and then needing to sit again,[16] and he had difficulty bending, could not crawl or kneel, could only walk two blocks before needing to rest, and used a cane when he left the house because his leg gave out. (Id.). Furthermore, he reported to Freedman fatigue, stress in his life, and sleeping problems two to three times a week related to stress, leg spasms, and pain. (Tr. 233, 247).

Based on plaintiff's prior work history, which Freedman classified as "mostly unskilled heavy duty types of work[,]" Freedman opined that plaintiff has "no transferability of skills except for similar type of work[,]" which is "out of the question" because of plaintiff's back condition. (Tr. 233, 235, 247, 249). He concluded the best job for plaintiff would be "sedentary to light work with a sit stand option at the unskilled level[,]" or as Freedman classified, "factory types of work tasks." (Tr. 235-36, 249-50).[17]

---

[16]Freedman supplemented this description with an anecdote from his work sample testing of plaintiff on March 23, 2010: "[Plaintiff] had requested to begin the work sample stand up but within about [ten] minutes he need[ed] to sit down. Then about another [five to ten] minutes later he need[ed] to stand again." (Tr. 232, 246; see also Tr. 235 and 249 (noting plaintiff requested to sit after nine minutes and stand again after ten minutes)). Freedman observed plaintiff's initial understanding of the instructions and quick commencement of the work, but as time went on, plaintiff experienced discomfort. (Tr. 235, 249). He noted, however, plaintiff did not request a break, even when he described his back pain as a seven on a pain scale of one to ten. (Id.). Rather, plaintiff "lean[ed] against the wall with one hand to get the pressure off of one of his legs." (Id.). Eventually, plaintiff requested a break, which was granted, and from which plaintiff resumed working after four minutes. (Id.). Freedman noted plaintiff was then offered to take breaks as needed, but he responded that "he would rather try to complete the task." (Id.). Plaintiff's alternated standing-sitting periods became shorter until plaintiff "complained of severe leg pain and said that he was having a spasm[,]" which lasted ten minutes. (Tr. 232, 246; see also Tr. 235, 249). He requested another break, which was granted. (Id.). Freedman opined the spasm looked severe where plaintiff was on the verge of tears from the pain. (Id.). Freedman concluded that plaintiff's "overall production suffered" at a production rate of 28%. (Tr. 235, 249).

[17]During the evaluation, Freedman also administered the Career Occupational Preference System (Tr. 233-35, 247-49), the results of which showed that plaintiff had "a poor knowledge of many areas of work[,]" but "likes jobs where he can work with [his] hands to help people." (Tr. 234, 248). Plaintiff learns better from doing or observing than reading textbooks, and plaintiff's

Freedman opined that plaintiff would only be able to return to competitive employment if he acquired "much more consistent physical capabilities than he possess[ed] at [the] time" of the assessment. (Tr. 243, 257; <u>see also</u> Tr. 49).[18] Plaintiff would have to be able to sit for two to two and a half hours at a time, and in order to qualify for light work, plaintiff would have to be able to lift and carry up to twenty to twenty-five pounds, as well as stand for up to six hours. (<u>Id.</u>). Freedman concluded that plaintiff "is not able to work competitively at this time[]" and "need[s] more training[]" if he wants to support himself and his family. (Tr. 243-44, 257-58).

On May 10, 2010, Dr. Becker was deposed in connection with plaintiff's Workers' Compensation case regarding his treatment of plaintiff for his back condition. (Tr. 259-97). Dr. Becker testified that he starting seeing plaintiff in October 1, 2004 for back and left leg pain, which complaints were supported by an MRI scan that showed arthritic changes at L5-S1 and "left disc herniation of moderate size." (Tr. 263-64). In December 2005, plaintiff injured his back, after which an MRI revealed a "huge central to left disc herniation at L5-

---

academic and social history show a tendency to make impulsive decisions that are "not always productive for him." (<u>Id.</u>). Based on plaintiff's work value scores, Freedman opined that plaintiff enjoys "practical types of work where he can see the outcome of his efforts[,]" such as a trade, and does not enjoy abrupt changes, but prefers "things laid out in an orderly fashion." (<u>Id.</u>). Plaintiff appeared to Freedman to prefer jobs associated with on-the-job or technical school training, but warned plaintiff would need "a great deal of guidance to . . . choos[e] work that would be consistent with his limitations[,]" as well as steer him away from impulsive decisions. (Tr. 234-35, 248-49).

[18]After completing a labor market survey based on plaintiff's work history, Freedman opined that plaintiff could work within the unskilled sedentary range as an electronic assembler, mechanical assembler, assembler I for the second shift, assembler, optical bonding/ electromechanical assembler, assembler II for the second shift, traditional security officer, and temporary bench assembler. (Tr. 236-43, 250-57). Freedman noted in his assessment that he "highlighted areas which would present problems for [plaintiff] to do such work[,]" but the record does not reflect this. (Tr. 236, 250). Freedman noted the presence of "aspects which would prevent [plaintiff] from being hired or working successfully in them at this time[]" due to plaintiff's lack of ability to stand with stability or sit for periods of time longer than Freedman's work sample testing. (Tr. 243, 257).

S1[.]" (Tr. 265).  Eventually, as discussed above, Dr. Becker performed spinal fusion surgery in September 2007. (Tr. 267).  According to Dr. Becker, plaintiff's surgery was not successful, as his back pain "really has not done well since surgery[ ,]" although his leg pain has resolved "fairly well[]" and any pain he may have was "[p]robably" due to scarring.  (Tr. 268-69, 271, 273).  Dr. Becker opined that plaintiff continues to have pain from possible scar tissue, and because his "abdominal muscles are weak[]" and his "weight is still way too high."  (Tr. 271; see Tr. 286).  Weight loss would "[p]robably" improve plaintiff's condition, but there are "[n]o guarantees," although Dr. Becker "certainly would recommend it."  (Tr. 272).  Additionally, according to Dr. Becker, it is "certainly possible" that plaintiff's work capacity would increase if he were to follow Dr. Becker's recommendations with regard to weight loss and improving his abdominal muscle tone.  (Tr. 280).  Specifically, Dr. Becker recommended that plaintiff pursue an exercise program for at least a year, and lose sixty pounds.  (Tr. 284-85).

Dr. Becker testified that plaintiff's complaints of pain are "not quite as severe[,]" and are "somewhat variable[,]" as there are times when plaintiff's muscle is tighter, in a spasm, but contrary to Freedman's assessment, Dr. Becker would not call it a "severe spasm[,]" as he had "never seen that extreme degree[,]" but he would "guess occasionally that could happen."  (Tr. 275, 289-90).  Additionally, according to Dr. Becker, "[m]ost of the time" plaintiff's gait is normal; it is only occasionally antalgic. (Tr. 275).  Dr. Becker prescribed a cane initially after surgery but he did not recall plaintiff using the cane.  (Id.).  Moreover, Dr. Becker testified that plaintiff has never described instances when his leg gave out, nor did Dr. Becker observe such instances, although "if [plaintiff] is carrying [sixty] extra pounds, there is . . . more likelihood that his leg might buckle."  (Tr. 294).  Additionally, plaintiff was taking, and would continue to take, Ultram.  (Tr. 282-83).

According to Dr. Becker, plaintiff would be able to sit for a maximum of twenty to thirty minutes before needing to change position (Tr. 276), and he would be able to lift thirty to thirty-five pounds, based on plaintiff's pain tolerance. (Tr. 278). Dr. Becker also agreed with Freedman's assessment that plaintiff would be able to lift and carry fifteen to twenty pounds, but if he had to lift and carry more often, his pain and spasms would increase, and he would have to alternate between sitting and standing every fifteen to twenty minutes. (Tr. 288-89; see Tr. 290).

Dr. Becker cleared plaintiff to return to work on June 30, 2008, for four hours a day, with light duty restriction, which meant lifting no more than fifteen pounds, and avoiding bending. (Tr. 277). Dr. Becker noted that a light duty work capacity is "certainly a work capacity that can't possibly cause any additional harm[,]" and in fact can be "therapeutic." (Tr. 279). In December 2009, Dr. Becker discussed "work possibilities" with plaintiff and plaintiff told him that there was nothing that he could do; on that basis, Dr. Becker recommended that plaintiff apply for Social Security benefits. (Tr. 279-80). Dr. Becker elaborated that he made this recommendation based on plaintiff's education, training, and physical condition, and after plaintiff's failed attempts to find suitable work. (Tr. 287). Dr. Becker also testified that he would "question" Freedman's conclusion that plaintiff would not be able to work competitively, as "[t]here are no validity criteria to this, [including "heart rate measurements or other statistical measurements,"] other than the report by the patient and just demonstrating pain or spasm at certain times." (Tr. 291-92).

Plaintiff returned to Dr. Becker on June 16, 2010 with continuing back pain.[19] (Tr. 300). He informed Dr. Becker that he had been approved for a gym membership and

_____

[19]But see Tr. 46 (reporting plaintiff's last visit to Dr. Becker being on June 6, 2010).

commencement of an exercise program.  (Id.).  Dr. Becker  noted "[a]bdominal obesity" and "laxity of the abdominal musculature[,]" and he recommended that plaintiff lose weight and exercise. (Id.).  Dr. Becker reported plaintiff "continues to have significant restrictions with regard to bending and lifting."  (Id.).

On August 27, 2010, plaintiff and Renee Jubrey, a VE, testified before ALJ Hogan. (Tr. 25-55).  Plaintiff arrived to the hearing using a cane, and he testified that he can only sit for fifteen minutes before experiencing pain, bend down only far enough to touch his knees, and walk two blocks before getting a pain down his right leg and sometimes in his left leg.  (Tr. 34-35, 46).  He also complained of lower back pain and "charlie horses."  (Tr. 35).

In addition to the daily activities discussed above, plaintiff testified that he is able to dress himself with occasional help pulling his socks on, is able to go in and out of the shower, and can do chores around the house, such as washing dishes and making the bed, if someone else did not do it for him.  (Tr. 35-37).  He continued, however, that he could not do the laundry because he "wouldn't be able to lift up too much."  (Tr. 37).

Plaintiff testified that his September 4, 2007 surgery did not relieve his back pain and since the procedure, he has constantly experienced right leg pain and numbness radiating to his foot, as well as occasional left leg pain.  (Tr. 45).  Plaintiff reported no change in his condition within the past year, and he testified that he loses control of his leg because it goes numb.  (Tr. 45-46).  Further, plaintiff claimed that he could lift fifteen to twenty pounds without re-injuring himself; however, he then testified that he experiences pain when lifting this amount, such that he "break[s] down, a lot of pain goes down to [his] leg[]" and he must lay down.  (Tr. 46).

During the hearing, plaintiff's attorney referenced Dr. Becker's deposition, wherein Dr.

Becker opined that a reasonable amount of time for plaintiff to sit or stand before changing position would be twenty to thirty minutes. (Tr. 47). Plaintiff's attorney further noted Dr. Becker's recommendation that plaintiff pursue Social Security disability benefits, and plaintiff testified in agreement with Dr. Becker's deposition testimony that "the more often [plaintiff] has to sit and carry, the more pain and spasm increase in his back and right leg[,]" such that he has to alternate between standing and sitting. (Tr. 47-48).

The VE testified that plaintiff's work at Saint Francis was medium unskilled work, at Burger King was medium skilled work, at UPS and Sysco was low semi-skilled work, and at Sears Outlet was medium unskilled work, but as plaintiff described it in his testimony, it was heavy unskilled work. (Tr. 52). The ALJ asked the VE's opinion on whether a hypothetical person of the plaintiff's "age, education and experience who's able to perform at the medium level," can sit or stand at will as long as "the person's not off task more than 10 percent of the work period," never uses ladders, ropes, or scaffolds, but occasionally stoops, crouches, kneels, and crawls can perform plaintiff's past work. (Id.). The VE answered in the negative because she has not "found medium work in the sit/stand at will option." (Id.). The ALJ then inquired as to whether the same hypothetical person with the same limitations could work at a light level. (Id.). The VE responded in the affirmative and listed positions as a cashier II, parking lot attendant, and ticket taker.[20] (Tr. 52-53).

In response to questioning from plaintiff's counsel, the VE testified that taking more breaks than are scheduled at an unskilled job level would create employment difficulties. (Tr. 53-54). She also stated that an employee's employability would be affected if the employee needed to go home earlier because of physical limitations or pain or miss one day a week

---

[20]Specifically, as a ticket taker, a stool could be provided so the person can sit and stand at will. (Tr. 54).

because of the person's condition.  (Id.).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable

physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a). If the claimant is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(e). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"]. The Grid places claimants with severe exertional impairments,

who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Hogan found that plaintiff has not engaged in any substantial gainful activity since October 30, 2008, the alleged onset date. (Tr. 9-10).  ALJ Hogan then concluded that plaintiff has the medically determinable severe impairment of residuals of status post L5-S1 decompression and fusion. (Tr. 10-12).  In the third step of the evaluation process, the ALJ concluded that plaintiff's impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 12-13).  In addition, at step four, ALJ Hogan found that after consideration of the entire record, plaintiff has the RFC to perform a full range of light work as defined in 20 C.F.R. §§  404.1567(b), 416.967(b), except plaintiff has the following limitations: he should be allowed to sit alternatively at will, as long as he is not off task more than ten percent of the work period; he is never able to climb ladders, ropes or scaffolds; and he is occasionally able to stoop, crouch, kneel and crawl.  (Tr. 13-19).  The ALJ continued that plaintiff is unable to perform any past relevant work as such work exceeds his RFC; however, relying on the testimony of the VE, there are jobs that exist in significant numbers in the national economy which plaintiff could perform.  (Tr. 19-21).  Accordingly, the ALJ concluded that plaintiff is not disabled.  (Id.).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds

that the ALJ's RFC finding that plaintiff can perform light work is not supported by substantial evidence as plaintiff's statement of pain "should ultimately be the determinative measure[,]" and there is no evidence in the record that contradicted Dr. Becker's opinion that plaintiff is unable to work. (Dkt. #18, Brief, at 8-10). Additionally, plaintiff contends that the ALJ's ruling that there are jobs that exist which plaintiff is capable of performing was based on a scenario presented to the VE that was not analogous to plaintiff's restrictions, and the ALJ erroneously disregarded Freedman's determination. (Id. at 11-12). Plaintiff moves in the alternative for a remand so that a functional capacity test can be given to plaintiff. (Id. at 12-13).

Defendant moves for an order affirming the decision of the Commissioner on grounds that the ALJ's determination that plaintiff can perform a limited range of light work is supported by substantial evidence as Dr. Becker opined that plaintiff could perform light duty work, Dr. Becker's opinion regarding plaintiff's functional limitations was largely consistent with the ALJ's RFC determination, the ALJ assigned proper weight, or the lack thereof, to Freedman's opinion, and the ALJ properly considered plaintiff's subjective allegations. (Dkt. #19, Brief at 9-13). Moreover, defendant contends that the ALJ's determination that plaintiff could perform other work existing in the national economy is supported by substantial evidence, including the VE's testimony. (Id. at 13-15). Defendant also contends that plaintiff has not met the requirements for a sentence six remand so that a functional capacity evaluation may be conducted, as there is no new and material evidence, and there is no need to further develop the record. (Id. at 15).

A. RFC ASSESSMENT

The RFC is the most of what an individual can still do despite his or her limitations.

SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[21] <u>Id.</u> (emphasis in original). As stated above, the ALJ concluded that plaintiff has the RFC to perform a full range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b),[22] except that plaintiff should be allowed to sit alternatively at will, as long as he is not off task more than ten percent of the work period; he is never able to climb ladders, ropes or scaffolds; and he is occasionally able to stoop, crouch, kneel and crawl. (Tr. 13-19). In his decision, the ALJ properly noted that the "record does not contain any opinions from the [plaintiff's] treating physicians that address the [plaintiff's] residual functional capacity in the format required by the [SSA]." (Tr. 14). However, the ALJ then addressed the medical opinion of plaintiff's treating physician, Dr. Becker, as reflected in his contemporaneous treatment records and deposition testimony. (Tr. 14-15).

Since June 30, 3008, Dr. Becker has opined that plaintiff may work in a light duty capacity, which opinion he repeated in September and November 2008, and again in June 2009. (Tr. 225-26, 228, 230). While in December 2009, Dr. Becker noted that "[d]ue to limitations with regard to work, [plaintiff] will pursue Social Security Disability benefits[,]" Dr.

---

[21] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." <u>Id.</u>

[22] 20 C.F.R. §§ 404.1567(b), 416.967(b) read:

   Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

Becker elaborated at his deposition that after he discussed "work possibilities" or the lack thereof with plaintiff, and the fact that plaintiff told him that there were no jobs that he could perform, Dr. Becker recommended that plaintiff apply for Social Security benefits. (Tr. 299; see Tr. 287). The ALJ was correct that this recommendation was not a medical opinion, as it was based in part on plaintiff's subjective allegations, and an opinion of disability is one reserved to the Commissioner. 20 C.F.R. § 404.1527(e).

Moreover, even with his recommendation that plaintiff apply for Social Security benefits, Dr. Becker also opined that a light duty work capacity is "certainly a work capacity that can't possibly cause any additional harm[,]" and in fact can be "therapeutic[ ]" for plaintiff. (Tr. 279). Dr. Becker opined that plaintiff could sit for a maximum of twenty to thirty minutes before needing to change position (Tr. 276); plaintiff could lift thirty to thirty-five pounds, based on his pain tolerance (Tr. 278); plaintiff could lift and carry fifteen to twenty pounds (Tr. 288-89); and plaintiff would have to alternate between sitting and standing every fifteen to twenty minutes. (Id.). Contrary to plaintiff's contention that the ALJ "did not give any weight to Dr. Becker's opinion that . . . [plaintiff's] pain rendered him disabled[,]" the ALJ's RFC assessment was largely consistent with Dr. Becker's opinion. (Dkt. #18, Brief, at 9-10). Furthermore, regarding plaintiff's ability to stoop or bend, plaintiff testified that he could bend and reach his knees, he could shower and dress without assistance, he was able to care for his two small children, and was capable of performing household chores, including make beds. (Tr. 31-32, 35, 37-38). Thus, while Dr. Becker answered in the affirmative that plaintiff would be restricted to no bending (see Tr. 278), the ALJ's finding that plaintiff is occasionally able to bend is supported by evidence in the record. The record is replete with plaintiff's complaints of pain, which pain Dr. Becker attributed to

scar tissue and "deconditioned musculature[,]" for which Dr. Becker repeatedly recommended weight loss and exercise. (Tr. 299; see Tr. 268-69, 271-73, 280, 284-85, 300). While plaintiff is correct that "pain is always bound to be a subjective measure[,]" (Dkt. #18, Brief at 10),[23] "disability [as defined by the Social Security Act] requires more than an inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983). For pain to be "disabling," it must be "so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful activity. Otherwise, eligibility for disability benefits would take on new meaning." Id. Moreover, it is within the ALJ's "discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

As in Dumas, plaintiff's treating physician noted plaintiff's unwillingness to heed his continuous recommendation to lose weight and commit to an exercise plan. See Dumas, 712 F.2d at 1553 ("A consistent concern of the physicians was that obesity aggravated all of the symptoms reported by Dumas[]" and "the physicians were frustrated by Dumas' unwillingness to help himself."). Dr. Becker opined that weight loss would "[p]robably" improve plaintiff's condition, and it is "certainly possible" that plaintiff's work capacity would increase if plaintiff were to follow his recommendations with regard to weight loss and improving his abdominal muscle tone. (Tr. 272, 280). As the Second Circuit had held, "a remediable impairment is not disabling[,]" Dumas, 712 F.2d at 1553 (citations omitted), and moreover, as discussed

---

[23]"It has been established, both in this Circuit and elsewhere, that subjective pain may serve as a basis for establishing disability, even if such pain is unaccompanied by positive clinical finds or other 'objective' medical evidence." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)(multiple citations omitted)(emphasis in original); see Rivera v. Schweiker, 717 F.2d 719, 724-25 (2d Cir. 1983).

above, plaintiff's treating physician, who was well aware of plaintiff's reports of pain, repeatedly opined that plaintiff is capable of performing light duty work with some limitations.[24]  Accordingly, substantial evidence supports the ALJ's RFC assessment.

## B. ALJ'S DETERMINATION THAT PLAINTIFF CAN PERFORM OTHER WORK

Plaintiff contends that the ALJ erred in presenting a hypothetical to the VE that excluded Dr. Becker's limitation of avoiding bending, and then erred in relying on the VE's testimony while rejecting Freedman's opinion.  (Dkt. #18, Brief, at 11-12).  For the reasons stated above, the ALJ did not err in assigning no weight to Freedman's ultimate conclusion as to plaintiff's ability to work, and thus the ALJ need not include such limitations in his RFC assessment or his hypothetical posed to the ALJ.  Additionally, as discussed above, the ALJ's conclusion that plaintiff is capable of occasional bending or stooping is supported by substantial evidence in the record, and thus the ALJ need not include a requirement to avoid bending in his hypothetical posed to the ALJ.[25]

---

[24]It is noted that the ALJ was correct to "not give any weight to the report/opinion of . . . Freedman in determining [plaintiff's RFC][.]" (Tr. 19).  As the ALJ and Dr. Becker observed, Freedman's conclusion that plaintiff can not work was based on plaintiff's "subjective self-described symptoms" (Tr. 19), and not based on "validity criteria . . . [including "heart rate measurements or other statistical measurements,"] other than the report by the patient and just demonstrating pain or spasm at certain times." (Tr. 291-92).  Moreover, only "acceptable medical sources" may establish the existence of a medically determinable impairment, see 20 C.F.R. §§ 404.1513(a), 416.913(a); can give medical opinions, see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); and can be considered treating sources whose opinions are entitled to controlling weight.  See 20 C.F.R. §§ 404.1527(d), 416.927(d).  In addition to the acceptable medical sources, the ALJ may also rely on other medical and non-medical sources "to show the severity of [the individual's] impairment(s) and how it affects [the individual's] ability to work." 20 C.F.R §§ 404.1513(d), 416.913(d).  However, Freedman's opinion that plaintiff could not work competitively is an opinion reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(opinions that a claimant is disabled or unable to work are opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case).

[25]In light of the conclusion reached above, there is no grounds to satisfy a remand.  (See Dkt. #18, Brief at 12-13; Dkt. #19, Brief at 15).

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #18) is <u>denied</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is <u>granted</u>.

The parties are free to seek the district judge's review of this recommended ruling. <u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 23rd day of September, 2011.


 _/s/ Joan G. Margolis, USMJ____
Joan Glazer Margolis
United States Magistrate Judge